[L.A. No. 31894. Dec. 30, 1985.]

GEORGE ARAKELIAN FARMS, INC., Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

**COUNSEL**

Dressler, Quesenbery, Laws & Barsamian, Dressler, Stoll, Quesenbery, Laws & Barsamian, Dressler, Stoll & Jacobs, Marion I. Quesenbery, Lewis P. Janowsky, Robert P. Roy and Donald G. Dressler for Petitioner.

Manuel M. Medeiros, Ellen Lake, Marvin J. Brenner, Elise B. Manders, Thomas M. Sobel, Michael G. Lee and Daniel G. Stone for Respondent.

Dianna Lyons, Daniel A. Garcia, Wendy Sones, Francis E. Fernandez, Marco E. Lopez, Carlos M. Alcala, Carmen S. Flores, Federico G. Chavez, Ellen J. Eggers, Jerome Cohen, Sanford N. Nathan, Tom Dalzell, Ellen Greenstone, Michael Heumann, Linton Joaquin, George C. Lazar, John Rice-Trujillo and Kirsten L. Zerger for Real Party in Interest.

Ronald A. Zumbrun, John H. Findley and Joseph E. Maloney as Amici Curiae.

OPINION

KAUS, J.*—George Arakelian Farms, Inc. (Arakelian) seeks review of a decision of the Agricultural Labor Relations Board (ALRB or board) which, on remand by the Court of Appeal following our decision in *J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1 [160 Cal.Rptr. 710, 603 P.2d 1306], imposed make-whole relief for losses suffered by its employees as a result of Arakelian's refusal to bargain with the United Farm Workers (UFW), the employees' elected and certified representative.

Two of the issues originally presented by this case were resolved in *Norton*—(1) whether Labor Code section 1156.3, subdivision (c), mandates a full evidentiary hearing for all objections to an election, and (2) under what circumstances Labor Code section 1160.3 authorizes the board to impose the make-whole remedy when an employer refuses to bargain in order to obtain judicial review of the board's action dismissing a challenge to an election certification.

Here we are asked to determine (1) whether the summary dismissal of some of the objections for failure to set forth a prima facie claim was an abuse of discretion, and (2) whether, on remand, the board correctly applied the holding of *Norton* in reimposing the make-whole remedy. We conclude: (1) the first issue is not subject to judicial review for failure by Arakelian to exhaust administrative remedies and (2) the board's decision to impose the make-whole remedy should be upheld.

FACTS

Arakelian challenged the validity of a representation election conducted in December 1976. Of the 168 ballots cast, 139 favored the UFW, 12 were for "no union," and 17 were challenged and unresolved.

Arakelian filed a timely petition (Lab. Code, § 1156.3, subd. (c) and Cal. Admin. Code, tit. 8, § 20365),[1] setting out five objections that allegedly

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

[1]Unless otherwise indicated, statutory references will be to the Labor Code. Title 8 of the California Administrative Code will be referred to simply as the Administrative Code.

warranted setting aside the election.[2] Pursuant to delegation of authority from the board (Admin. Code, § 20365, subd. (e)), its executive secretary reviewed the objections and determined, with respect to four of them, that the employer failed to satisfy the administrative requirements for establishing a prima facie case. (*Id.*, § 20365, subds. (a)-(d).) He summarily dismissed the four deficient objections, with a written order stating the reasons for dismissal.[3] (*Id.*, § 20365, subd. (e).) Arakelian's request for review by the board was untimely. (*Id.*, § 20393, subd. (a).)[4] (The dismissal order of May 11, 1977, was served on Arakelian on May 15; the request for review was mailed on May 24 and received on May 27.) The board summarily denied the request on July 1, 1977. Arakelian did not ask the board to

---

[2]One objection alleged that the UFW had violated access rules during the election campaign. The other objections were directed at the action of the board's agent in supervising the pre-election conference and in exercising discretion as to times and places of balloting and the number of observers at the election sites.

[3]The order of partial dismissal, dated May 11, 1977, reads in pertinent part: "1. The objection that the Board agent acted in a biased manner at the pre-election conference is dismissed on the grounds that employer has failed to present evidence of bias. A Board agent has discretion to set the time and place of an election, *Melco Vineyards,* 2 ALRB No. 14, and the mere setting of an election over specific opposition of the employer as to time and place is not evidence of bias. [¶] 2. The objections to the use of union interpreters and to the number of observers are dismissed on the grounds that bias or the appearance of bias does not constitute grounds for setting aside an election unless it is shown to have affected the conduct of the election itself and to have impaired the balloting's validity as a measure of employee choice. There is no showing that either the use of an interpreter or the setting of the number of observers in accordance with petitioner's desires impaired the validity of the ballot as a measure of employee choice. [¶] 3. The objection that the election site itself had an adverse influence on employee choice is dismissed on the grounds that employer has not provided any evidence that weather, lighting or the site itself caused any employee not to vote or to be prevented from exercising his free choice. *NLRB* v. *Wolverine World Wide,* 477 F.2d 969 (6th Cir.) 83 LRRM 2309 (1973). [¶] 4. The objection that the hours of balloting put the employer at a disadvantage with the union is dismissed on the grounds that there is no evidence that the hours of balloting intimidated or disenfranchised any voter. *Ralph Samsel Co.,* 2 ALRB No. 10."

[4]At the time, section 20393, subdivision (a) provided: "Dismissal of a representation petition, cross-petition, or intervention petition by a regional director or dismissal by the executive secretary of a petition filed pursuant to Labor Code Section 1156.3(c), either in its entirety or in part, may be reviewed by the Board pursuant to Labor Code Section 1142(b) upon a written request for review filed by the party whose petition was dismissed. The request for review shall be filed with the Board within five days of service of the dismissal upon the party making the request. Such a request may be timely filed by deposit of the request and supporting documents in registered mail properly addressed to the Board and postmarked within the 5 day filing period. The request shall set forth with particularity the basis for the request and shall be accompanied by two copies of the following: (1) the evidence and legal argument which the party seeking review contends support the request; (2) the representation petition; (3) the petition pursuant to Labor Code Section 1156.3(c) where applicable; (4) the regional director's notice of dismissal of the representation petition and statement of reasons therefor, where applicable; (5) all other documents submitted to the regional director and upon which he or she based his or her decision, where applicable; and (6) evidence that the aforementioned material has been served upon all parties pursuant to Section 20430."

reconsider its denial as provided by section 20393, subdivision (c) of the Administrative Code, nor did it present reasons for, or seek relief from, its late submission. Although the denial order did not state reasons, more than a year later, in its decision certifying the UFW (*George Arakelian Farms, Inc.* (1978) 4 ALRB No. 6), the board noted: "In its post-hearing brief the Employer requested that further evidence be allowed on the objections dismissed by the Executive Secretary. We note that the Employer's request for review pursuant to 8 Cal. Admin. Code § 20393 was dismissed on the grounds that it was not timely filed. We deny the Employer's current request that further evidence be allowed on these issues." (*George Arakelian Farms, Inc., supra,* 4 ALRB No. 6.)

The remaining objection, relating to access rule violations, was scheduled for hearing (Admin. Code, § 20365, subd. (g)), and such hearing was held (*id.,* § 20370). The hearing officer found access rule violations, but concluded they had no coercive effect on the employees or on the outcome of the election. The hearing officer then dismissed the objection and recommended that the UFW be certified as the collective bargaining representative.

On November 17, 1977, Arakelian filed timely exceptions to the hearing officer's conclusions and recommendations. (*Id.,* § 20370, subd. (d).) On February 2, 1978, the board considered and dismissed the employer's objection "based on the record of hearing conducted before the hearing officer" and certified the UFW as the exclusive bargaining representative of Arakelian's employees. (*George Arakelian Farms, Inc., supra,* 4 ALRB No. 6.)

Rather than accede to the ALRB's certification decision without judicial review, Arakelian refused to bargain with the UFW. Consequently, on March 3, 1978, the union brought an unfair labor practice charge against Arakelian for refusal "to bargain collectively in good faith with [a certified] labor organization." (§ 1153, subd. (e).)

In response to the complaint of unfair labor practice in refusing to bargain, Arakelian argued that the certification was not valid and urged the board to reexamine its determination regarding the violations of the access rule. Arakelian also complained that the other objections had never been set for hearing "even though appeals and repeated efforts were made to obtain a hearing on the merits" of the objections.

In its first decision (*George Arakelian Farms, Inc.* (1978) 4 ALRB No. 53), the board refused to relitigate the representation issues—the access rule

violations. It found Arakelian's refusal to bargain an unfair labor practice (§ 1153, subds. (a) and (e)) and, in accord with *Perry Farms* (1978) 4 ALRB No. 25 and *Adam Dairy* (1978) 4 ALRB No. 24, imposed the make-whole remedy. Regarding the due process complaint that other objections had not been set for hearing, the board stated the rule, later affirmed by us in *Norton,* that the statute (§ 1156.3, subd. (c)) requires a hearing only where facts are alleged which, if true, would constitute grounds for refusing to certify the election. (4 ALRB No. 53, p. 3, fn. 1.)

On August 25, 1978, Arakelian filed a petition for writ of review in the Court of Appeal. (§ 1160.8.) It urged the court to set aside the decision on grounds (1) the certification was invalid and (2) even assuming the certification was valid, the board nevertheless abused its discretion in applying the make-whole remedy. Concerning the error in certification of the election, Arakelian claimed that it was entitled, under section 1156.3, subdivision (c) and due process, to a hearing on *all* of its objections and, furthermore, that it had presented sufficient objections to establish a prima facie case of conduct which affected the results of the election. Arakelian did not, however, seek judicial review of the board's ruling on the access violations.

Inasmuch as the petition for review presented issues then before us in *Norton,* the Court of Appeal deferred resolution of the matter pending our decision. In *Norton,* filed on December 12, 1979, we held that "the Legislature did not intend section 1156.3, subdivision (c), to be construed so broadly that it requires the Board to hold a full evidentiary hearing in cases in which the objecting party has failed to establish a prima facie case for setting an election aside . . ." and that "section 1160.3 does not authorize the Board to impose the make-whole remedy as a matter of course in cases in which an employer has refused to bargain in order to obtain judicial review of the Board's dismissal of his challenge to an election certification." (*Norton, supra,* 26 Cal.3d at p. 9.)

In February 1980, the Court of Appeal remanded Arakelian's case to the board for reconsideration of its imposition of the make-whole remedy in light of our decision in *Norton.* Following supplementary briefing on the standards to be applied and the evidence to be considered on the remand, the board reimposed the make-whole remedy. (*George Arakelian Farms, Inc.* (1980) 6 ALRB No. 28.)

Arakelian now seeks review of the board's second decision. (§ 1160.8.) In a brief filed September 18, 1980, it conceded that *Norton* is controlling and that it had no absolute right to a hearing on its objections, but claims that the board nevertheless abused its discretion in failing to set its objec-

tions for hearing. Further, it contends that the board did not properly apply the *Norton* standards to grant make-whole relief. Again Arakelian does not seek judicial review of the board's ruling on the access violations.

## I

### VALIDITY OF THE CERTIFICATION

 Arakelian challenges the validity of the board's certification of the UFW as the employees' bargaining representative on grounds that it is entitled to judicial review of the decision of the executive secretary dismissing four of the five objections to the election. (See fn. 3 above.) The threshold question, however, is whether Arakelian is precluded from judicial review, provided by section 1160.8, for failure to seek timely review of the executive secretary's partial dismissal order, as provided by the regulations, namely sections 20365, subdivision (h) and 20393 of the Administrative Code.[5]

As noted, the executive secretary issued his order of partial dismissal on May 13, 1977; Arakelian mailed its request for review on May 24, 1977. The board rejected the request as untimely on July 1, 1977. The regulations provide for the filing of a request for review "within five days of service of the dismissal upon the party making the request." (Admin. Code, § 20393, subd. (a).) Section 20480, subdivision (a) of the same code modifies that time period to exclude Sundays and legal holidays from the computation and to add three days when service is made by mail. Arakelian's request for review was clearly and concededly untimely under the regulations.

As also noted, Arakelian did not ask the board to reconsider its denial, as provided by section 20393, subdivision (c) of the Administrative Code. At no time did Arakelian explain its late submission or ask for relief from the late filing. Were it not for the one objection that was scheduled for hearing, the board could have certified the election at that time as a matter of course (*id.*, § 20380). (See *Highland Ranch* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 848, 853 [176 Cal.Rptr. 753, 633 P.2d 949].)

 When an administrative tribunal is created by the Legislature, the requirement of exhaustion of administrative remedies is jurisdictional.

---

[5]Although Arakelian has throughout challenged the validity of the certification, it has not disputed the board's resolution of the single election objection which was the subject of a board hearing (the allegation of unlawful access on the grower's property). Rather, Arakelian has argued that it was entitled as a matter of law to a hearing on all the election objections.

(*Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 293 [109 P.2d 942, 132 A.L.R. 715].) The doctrine has been invoked to bar legal proceedings in many situations (see generally, 3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 234, pp. 264-266), including disputes before the ALRB. (*Butte View Farms* v. *Agricultural Labor Relations Bd.* (1979) 95 Cal.App.3d 961, 971 [157 Cal.Rptr. 476]; see also *Rivcom Corp.* v. *Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743 [195 Cal.Rptr. 651, 670 P.2d 305].) The NLRB has similarly invoked the doctrine to refuse to entertain untimely requests for review of election issues determined by its personnel at preliminary stages of the election procedures. In *A.S. Horner* (1979) 246 NLRB No. 49 [102 LRRM 1535], for example, failure to dispute a determination as to eligibility to vote precluded consideration of the question on review of unfair labor charges stemming from the election. (See also *Walnut Mountain Care Center* (1978) 236 NLRB No. 40 [98 LRRM 1584]; *American Optical Co.* (1977) 229 NLRB No. 148 [96 LRRM 1312].)

█ Arakelian makes several arguments for excepting this case from the general rule. It is suggested that section 1013 of the Code of Civil Procedure is applicable to the time periods prescribed by the regulations of the ALRB.[6] However, the regulations are very specific as to time limits, and there can be no doubt that the sections here at issue (Admin. Code, §§ 20393, 20480) were designed to resolve election matters quickly so as to expedite collective bargaining while providing time for review of election objections. If there is any conflict between Code of Civil Procedure section 1013 and the regulations of the board, the latter, promulgated pursuant to section 1144 of the Labor Code, prevail. (§ 1166.3, subd. (b): if "any other act of the Legislature" conflicts with the Agricultural Labor Relations Act, the act "shall prevail"; see also *Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 420 [128 Cal.Rptr. 183, 546 P.2d 687].)

Arakelian also argues that exhaustion would have been futile. █ Insofar as a "futility" exception exists, as when it can be demonstrated that an agency's decision is certain to be adverse (see *Ogo Associates* v. *Torrance* (1974) 37 Cal.App.3d 830 [112 Cal.Rptr. 761]), its application is very limited. Thus, exhaustion of administrative remedy is required unless the appellant "can *positively* state that the [administrative agency] has declared what its ruling will be in a *particular* case." (*Gantner & Mattern Co.* v. *California E. Com.* (1941) 17 Cal.2d 314, 318 [109 P.2d 932], italics added.) █ There is no indication in this record to show that, at the time that a request for review would have been timely, the board had pre-

---

[6]Section 1013 provides generally that service of a notice or other paper is complete at the time of deposit in the mails, with a five-day grace period.

determined its position as to the particular election objections that had been dismissed by the executive secretary.

Based on the foregoing, we conclude that the exhaustion of remedies doctrine is applicable to this case, that Arakelian failed to file for timely review by the board or to take available actions to have its late filing excused, and that it is therefore precluded from obtaining judicial review of its election objections which had been dismissed by the executive secretary. The certification of the UFW as the bargaining representative of the workers is therefore valid, and Arakelian's refusal to bargain constitutes an unfair labor practice.

## II

### MAKE-WHOLE RELIEF

Arakelian's second contention is that the board erred in granting make-whole relief. Specifically, it is urged that the board misapplied the guidelines we set out in *Norton.*

Although, in *Norton,* we recognized that "make-whole relief serves the salutary purpose of discouraging frivolous election challenges designed to stifle employees' self-organization" (*Norton, supra,* 26 Cal.3d at p. 31), we rejected the board's "blanket rule for the application of the make-whole remedy in all cases in which an employer is found to have refused to bargain in contravention of Labor Code section 1153, subdivision (e)." (*Id.,* at pp. 27-28.) We concluded that, inasmuch as the board's certification ruling is subject to judicial review only if the employer first engages in an unfair labor practice, a blanket rule for imposition of the make-whole remedy "places burdensome restraints on those who legitimately seek judicial resolution of close cases in which a potentially meritorious claim could be made that the . . . ALRB abused its discretion." (*Id.,* at p. 32.)

*Norton* sought to balance, on the one hand, the interests of employees in compensation for the losses incurred by the delay of collective bargaining and, on the other, the interests of employers in pursuing judicial review of what they perceive to be arbitrary board action. Such review, we stated, "undermines ALRA policy only when the employer's election challenges lack merit and are pursued as a dilatory tactic designed to stifle union organization." (*Id.,* at p. 36.)

The board, therefore, was told that it must "carefully evaluate the asserted grounds for ordering make-whole relief." Such evaluation necessar-

ily requires the board to examine "the facts and equities of each particular case." (*Id.*, at p. 38.) We provided guidelines: "[T]he Board must determine from the totality of the employer's conduct whether it went through the motions of contesting the election results as an elaborate pretense to avoid bargaining or whether it litigated in a reasonable good faith belief that the union would not have been freely selected by the employees as their bargaining representative had the election been properly conducted." The board is not to impose make-whole relief just because it finds that the employer has failed to present a prima facie case; neither is the board deprived of its make-whole power by every colorable claim of violation. "[I]t must appear that the employer reasonably and in good faith believed the violation would have affected the outcome of the election." (*Id.*, at p. 39.)

We come then to the question whether we can uphold the imposition of make-whole relief in this case—whether the record supports the conclusion reached by the board that Arakelian did not litigate "in a reasonable good faith belief that the union would not have been freely selected by the employees as their bargaining representative had the election been properly conducted" (*Norton, supra,* 26 Cal.3d at p. 39).

On remand after *Norton,* the board invited supplementary briefing on the standards to be adopted for make-whole relief and the kinds of supporting evidence to be considered in applying the standards. Arakelian urged that the board adopt a "frivolous/debatable" standard—that is, "make-whole should be awarded only in those cases where there is shown a clear and flagrant refusal to bargain for patently frivolous reasons." The union advanced the "election determinative" test and argued that "[a]bsent an affirmative showing, by the objecting employer, that *but for* the objectionable conduct of the election, the Union would not have been selected, the make-whole remedy should apply"—essentially a rebuttable presumption of the applicability of make-whole relief. The board, for its part, proposes a standard somewhere between the two extremes, requiring consideration of both the debatable merit of the employer's election challenge and the employer's motive for seeking judicial review. The proposal accords with the guideline we set out in *Norton* that the board base its determination on the "totality of the employer's conduct," recognizing that there are "degrees of violations" and that the board's remedial powers exist "to effectuate the purposes of the Act." (*Norton, supra,* at pp. 39-40.) ■ Thus, the reasonableness of the challenge consists of an objective evaluation of the claims in the light of legal precedent, common sense, and standards of judicial review, and the board must look to the nature of the objections, its own prior substantive rulings and appellate court decisions on the issues of substance. Pertinent

too, are the size of the election, the extent of voter turnout, and the margin of victory.

From the pleadings, we discern that Arakelian's primary legal challenge was what it perceived to be its absolute right to an investigation and hearing on *all* of its election objections. At the time that Arakelian refused to bargain with the duly certified union—1978—we had not decided *Norton,* and Arakelian cannot be faulted for anticipating a favorable ruling on that point. While a Court of Appeal had ruled against mandatory hearings (*Radovich* v. *Agricultural Labor Relations Bd.* (1977) 72 Cal.App.3d 36, 45 [140 Cal.Rptr. 24]), as Arakelian notes, the ruling, issued in the Fifth Appellate District, would not necessarily be followed by the Fourth District, site of the Arakelian appeal. (*Swinerton & Walberg Co.* v. *City of Inglewood-L.A. County Civic Center Authority* (1974) 40 Cal.App.3d 98, 101 [114 Cal.Rptr. 834]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 667, p. 4580.)

Assuming for the sake of argument, however, that a mandatory hearing on all objections under section 1156.3, subdivision (c) was still an open question when Arakelian refused to bargain, it does not follow that Arakelian could reasonably believe that the conduct complained of in its particular objections affected the election process so as to make it even remotely possible—granted an investigative hearing—that the election would be overturned.

Aside from the issue of mandatory hearing, Arakelian's litigation posture at the time of its refusal to bargain consisted of a claim that the board had abused its discretion in dismissing the alleged access violations objection for failure to establish that the violations had any coercive effect on the employees or the outcome of the election. As shown, however, that claim was dropped at the judicial level. As to the four other objections—alleged bias and misconduct of the board agent—Arakelian was limited to a claim of error by the executive secretary in dismissing for failure to state a prima facie case. Further, because of Arakelian's admitted untimeliness in seeking board review, Arakelian could only hope that by some legal legerdemain it could ultimately secure review by the board despite the failure to exhaust administrative remedies and, of course, that such review would prove favorable.

We reemphasize that the issue before us therefore is not the executive secretary's alleged error in dismissing the four objections of bias and misconduct or the board's alleged error in dismissing the objection as to access violations. We must determine whether the circumstances under which Ar-

akelian sought review, including the quality or substantive merit of the case to be reviewed, supported a reasonable, good faith belief that the election would eventually be set aside. We examine the evidence in that light.

Subdivision (c) of Administrative Code section 20365 requires an objections petition to be accompanied by "a declaration or declarations setting forth facts which, if uncontroverted or unexplained, would constitute sufficient grounds for the Board to refuse to certify the election." In support of its allegations of misconduct, Arakelian proffered the declaration of vice president Dan Arakelian which alleged that the board agent's conduct at the pre-election conference held two days before the election was "biased and openly supportive" of the union. The declaration discloses that the board agent (1) delayed the convening of the conference for 90 minutes until the arrival of the union representatives; (2) used a union organizer as interpreter until the company complained; and (3) sided with the union on decisions regarding the location and time of election and the number of observers. Specifically, the company wanted a single site for voting—the field where the employees were working—while the union wanted a second site—Calexico—for potential voters who were not currently working for the company. The company wanted the voting site in Calexico to be more distant from the union's office than the one chosen. As to the hours designated for voting, the board agent acceded to the union's request for thirteen hours— five hours in the morning in Calexico, three hours in the field, and five hours in the evening in Calexico—rather than the company's suggestion of two hours at Calexico in the morning and two hours in the field during the day. And, finally, the company's request for two observers at any one time was rejected in favor of the union's request for four.

Declarations from three employees who served as election observers for Arakelian at the Calexico site described the cold of the early morning voting period and the lack of facilities.

The executive secretary concluded (see fn. 3, above) that the facts set forth in these declarations would not, even if true, constitute sufficient grounds for the board to refuse to certify the election. The executive secretary noted that the mere setting of an election over specific opposition as to time and place is not evidence of bias and that neither the use of the union member as interpreter nor the selection of the number of observers or of a particular site over objections of the company is grounds for setting aside an election absent evidence that it affected the conduct of the election itself or impaired the balloting's validity as a measure of employee choice.

The declarations disclose only that the board agent ruled against the company on certain issues. There is no claim that the rulings were erroneous.

Nor is there any evidence that the board agent's rulings which favored the union, of themselves, had any potential for interfering with the employees' free choice. The declaration of Dan Arakelian discloses that "numerous" workers were present at the pre-election conference, but no numerical count is ventured. In view of the overwhelming nature of the union's election victory—139 to 12—the board agent's rulings appear to be of minimal significance.

In this regard, we contrast a decision of the National Labor Relations Board (NLRB) relied upon by Arakelian for the proposition that misconduct by the board's agent in permitting union members to act as interpreters compromises the neutrality of the board's agent and is grounds for setting aside an election. In *Alco Iron & Metal Co.* (1984) 269 NLRB No. 87 [115 LRRM 1322], however, the translations occurred *at the voting booth*. A union observer (who was also an employee) was asked to explain the voting procedures to Spanish-speaking voters. He did so, in free form—saying whatever he wished—to about eight or ten voters. When the employer's observer complained, the union observer advised an additional five or seven voters, but did so by translating the words of the board's agent. The conduct in *Alco* affected or could have affected more than half the votes: 18 employees were eligible to vote; only 4 or 5 of the 14 Spanish-speaking voters also spoke English.

This case is quite different. The union interpreter was permitted to translate at the pre-election conference for only a few minutes until the employer's representative complained, and there is no suggestion that a significant number of potential voters was present. Further, the accepted standard under the ALRA for evaluating a board agent's misconduct is stated in *Coachella Growers, Inc.* (1976) 2 ALRB No. 17: "[T]o constitute grounds for setting an election aside, bias or an appearance of bias must be shown to have affected the conduct of the election itself, and have impaired the balloting's validity as a measure of employee choice."

On the record before it, the board could determine "from the totality of the employer's conduct," as directed in *Norton,* that Arakelian "went through the motions of contesting the election results as an elaborate pretence to avoid bargaining" and did not litigate "in a reasonable good faith belief that the union would not have been freely selected by the employees as their bargaining representative had the election been properly conducted."

We have not discussed Arakelian's fifth objection, relating to access rule violations, which was dismissed by the board after hearing. Our review of

the record convinces us that the board's decision on the alleged access violations played no role in Arakelian's refusal to bargain. As noted, the original petition for review to the appellate court in 1978 did not address the access violations. In supplemental briefing to the appellate court after the board decision on remand in 1980, Arakelian repeated that its challenge to the certification was based on the board's error in dismissing four objections without an investigative hearing. Inasmuch as Arakelian did not submit the board's decision on the access violations to the judicial forum, we must conclude that its earlier refusal to bargain was not premised on a desire to seek judicial review of the board's decision on that election objection.

The award of make-whole relief shall be upheld. We reach this conclusion based on the failure to exhaust administrative remedies and the insufficiency of the declarations as to the bias and misconduct allegations. These considerations, coupled with the resounding margin (92 percent) of the union's victory, preclude a reasonable belief that Arakelian had a meritorious challenge to the integrity of the election when it refused to bargain.

Let a decree issue enforcing the board's order in full.

Broussard, Acting C. J., Mosk, J., Reynoso, J., and Grodin, J., concurred.

**LUCAS, J.**—I respectfully dissent. The majority upholds the Agricultural Labor Relations Board's (Board) award of "make-whole" relief, based upon its conclusion that petitioner's refusal to bargain was not premised on a reasonable belief that it had a meritorious challenge to the integrity of the election which purportedly certified the United Farm Workers (UFW) as the employees' bargaining representative. My review of the record indicates otherwise.

Rather than prolong this opinion with a factual recital of little interest or legal significance to anyone other than the parties hereto, I simply adopt that portion of Justice Kaufman's now vacated opinion for the Court of Appeal, Fourth Appellate District, in this case which correctly disposed of the point:

"As stated most recently in *Rivcom Corp.* v. *Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743, 772 [195 Cal.Rptr. 651, 670 P.2d 305]: '[T]his court held in *J. R. Norton* [*Co.* (1979) 26 Cal.3d 1 (160 Cal.Rptr. 710, 603 P.2d 1306)] that the [make-whole] remedy may not be used when the employer commits a "technical" refusal to bargain as the only means to obtain judicial review of a colorable, good-faith challenge to union certification.

If a sincere but unsuccessful challenge exposed the employer to liability for all gains prompt bargaining might have produced, . . . meritorious challenges, which serve the Act's purposes, would be deterred.'

"In reconsidering the propriety of imposing the make-whole remedy in this case following the remand from [the Court of Appeal], the Board reviewed all four of Arakelian's objections to the election, not just the access rule violations objection, and considering them separately, rejected each. As to the objection that, without regard to their merit, the Board agent had ruled invariably in favor of the UFW on each contested issue concerning the election arrangements, in some cases altering his previously announced decision to accommodate the union's preferences, the Board stated: 'Citing Melco Vineyards, 2 ALRB No. 14 (1976), the Executive Secretary dismissed this objection on the grounds that [Arakelian] failed to present evidence of bias, *as a Board agent has discretion to set the time and place of an election,* and setting an election over the specific objection of an employer does not constitute evidence of bias.' (Italics added.)

"As to the objection the Board agent had given the appearance of bias by delaying the start of the pre-election conference for an hour and a half to accommodate the arrival of UFW representatives, by selecting a UFW organizer to act as interpreter when other interpreters were available and by making decisions as to the time, locations and number of observers for the election invariably in accordance with the UFW's suggestions and without regard to their merit the Board stated: 'The Executive Secretary dismissed the objection to the use of a UFW representative as an interpreter . . . and to the Board agent's decision about the number of observers on the grounds that bias or the appearance of bias does not constitute grounds for setting aside an election *unless it is shown to have affected the conduct or results of the election* or to have impaired the validity of the balloting as a measure of employee choice, which [Arakelian] failed to show.' (Italics added.)

"The remaining objections were also rejected on the ground there was no evidence they had affected the election. The Board then concluded: 'Upon reconsideration of these objections . . . we conclude that [Arakelian's] objections to the election are not substantial enough to support a reasonable, good faith belief "that the union would not have been freely selected by the employees as their bargaining representative had the election been properly conducted." . . . Each objection was dismissed either for lack of supporting evidence or because it clashed with an established labor law principle. In refusing to bargain and pursuing its objections through litigation, [Arakelian] did not satisfy the requirement that its "litigation posture must have been *reasonable* at the time of the refusal to bargain." ' (Italics in original.)

". . . [T]he Board's imposition of the make-whole remedy in the circumstances shown here was patently not in keeping with either the letter or the spirit of the *Norton* decision. As the court in *Norton* took pains to say: 'We emphasize that this holding [that a make-whole remedy is appropriate if the employer's contesting the election was an elaborate pretense to avoid bargaining] does not imply that whenever the Board finds an employer has failed to present a prima facie case, and the finding is subsequently upheld by the courts, the Board may order make-whole relief. Such decision by hindsight would impermissibly deter judicial review of close cases that raise important issues concerning whether the election was conducted in a manner that truly protected the employees' right of free choice.' (*J. R. Norton Co.*, *supra*, 26 Cal.3d at p. 39.)

"Except for the objection based on union violations of the access rule as to which a hearing had been granted, Arakelian's objections were based primarily on alleged Board agent misconduct. Arakelian was contesting the propriety of the standard employed by the executive secretary and the Board to determine whether the asserted Board agent misconduct constituted a prima facie case for setting aside the election. At the time there was no California appellate decision on the question, and the standard employed by the executive secretary and the Board was not the standard applied to Board agent misconduct by the National Labor Relations Board (NLRB). In addition, the *Norton* decision had not yet come down; indeed, hearing in the *Norton* case had not been granted by the California Supreme Court at the time Arakelian's petition for review was filed in this court, and Arakelian was also contending that a hearing on its objections was mandatory under section 1156.3, subdivision (c), of the ALRA . . . and that the Board's routine imposition of a make-whole remedy was impermissible under the ALRA, both of which contentions raised significant issues of first impression later decided in *Norton*. [Fn. omitted.] Except for the happenstance that the *Norton* case reached the Supreme Court before review in this case had been completed, this case might well have been the one in which those issues were resolved.

"There is nothing in the record of this case indicating petitioner was contesting the election in bad faith or that its objections constituted a 'frivolous election [challenge] pursued by [it] as a dilatory tactic designed to stifle self-organization by [its] employees.' (*J. R. Norton Co.*, *supra*, at p. 30.) On the contrary, the record demonstrates that petitioner's objections raised three fundamental questions relating to election procedure and that Arakelian did everything within its power to expedite resolution of its election challenge. In the hearing on its access rule violations objection, it stipulated to the facts and in the unfair labor practice proceedings it agreed to

have the matter transferred directly to the Board and again stipulated to the facts. It was the Board and UFW that suggested to this court [that] our review be held in abeyance pending the Supreme Court decision in the *Norton* case, and petitioner is in no way responsible for the subsequent delays in obtaining judicial review in this case.

"The Board's implied conclusion that Arakelian's objections to the election were pursued in bad faith and as a dilatory tactic is without evidentiary foundation and the imposition of the make-whole remedy in these circumstances is contrary to the *Norton* decision and inconsistent with the purposes of the ALRA."

In addition to Justice Kaufman's analysis, I observe that, as a practical matter, assessment of the make-whole remedy at this late date (the contested election was held in *1976*) could potentially ruin Arakelian, yet much of the delay in adjudicating the issue was not attributable to that party. Under these unusual circumstances, strict application of the remedy should be excused or ameliorated.

For the foregoing reasons, I would annul the Board's order requiring petitioner to make its employees whole for all losses sustained by reason of petitioner's refusal to bargain.

Sabraw, J.,* concurred.

---

*Assigned by the Acting Chairperson of the Judicial Council.