[No. C000206. Third Dist. May 12, 1987.]

WILLIAM DAL PORTO & SONS, INC., Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO, Real Party in
Interest.

**COUNSEL**

Nomellini & Grilli, Dante John Nomellini and Daniel A. McDaniel for Petitioner.

Daniel G. Stone and Michael E. Hersher for Respondent.

Dianna Lyons and Daniel A. Garcia for Real Party in Interest.

## OPINION

SIMS, J.—In *William Dal Porto & Sons, Inc.* v. *Agricultural Labor Relations Bd.* (1984) 163 Cal.App.3d 541 [210 Cal.Rptr. 241] (*Dal Porto I*) we affirmed the Agricultural Labor Relations Board's (Board) finding that Dal Porto committed unfair labor practices in violation of section 1153, subdivisions (a) and (e), of the Agricultural Labor Relations Act of 1975 (hereafter ALRA) (Lab. Code, § 1140 et seq.)[1] by bargaining in bad faith with regard to issues of union security and by unilaterally raising wages of certain employees. However, we annulled the Board's finding that Dal Porto bargained in bad faith on the issue whether any successor of Dal Porto would be bound by a collective bargaining agreement signed by Dal Porto. (*Id.,* at p. 563.)

Declining to assume the Board would impose the same remedy for two violations of the ALRA that it did for three, we annulled the Board's order for "make-whole" relief and remanded to the Board for formulation of a new remedial order. (*Ibid.*)

Following our remand, the Board reevaluated the evidence in the proceeding and concluded its order of make-whole relief remained warranted under the narrower finding of bad faith bargaining affirmed by this court. (*William Dal Porto & Sons, Inc.* (1985) 11 ALRB No. 13, at p. 2.) The Board's remedial order requires in pertinent part that Dal Porto "(d) Make whole its present and former agricultural employees for all losses of pay and other economic losses they have suffered as a result of Respondent's failure and refusal to bargain in good faith with the UFW, such amounts to be computed in accordance with established Board precedents . . . ." (*Id.,* at pp. 5-6.) So far as the record before us discloses, the parties have not consummated a collective bargaining agreement.

Dal Porto now seeks review of the Board's remedial order. (§ 1160.8.) Dal Porto contends: (1) the make-whole remedy may be not be imposed in the absence of a finding by the Board that the parties would have entered into a collective bargaining agreement but for the employer's bad faith bargaining; (2) the Board's findings establish that the failure to reach agreement on a contract was not due to Dal Porto's improper conduct; (3) the Board's remedial order impermissibly shifts the "burden of proof" to the employer; (4) section 1160.3 is unconstitutional because it denies employers the equal protection of the laws; (5) as applied in this case, the make-whole remedy is excessive and punitive; (6) the Board's remedial order compels Dal Porto to make bargaining concessions; and (7) the Board's failure to

---

[1]Statutory references are to the Labor Code unless otherwise indicated.

afford Dal Porto a hearing following remand from this court violated due process and requires reversal of the Board's order.

We conclude only Dal Porto's first contention has merit. We shall remand the case once again to the Board to allow it to make a finding whether the parties would have consummated a collective bargaining agreement providing for higher pay for employees in the absence of Dal Porto's unlawful refusal to bargain. We shall direct the Board to apply a rebuttable presumption, affecting the burden of proof, that such an agreement would have been consummated had the parties bargained exclusively in good faith. We shall therefore give Dal Porto the chance to show the parties had bargained in good faith to impasse, so that its refusal to bargain on certain issues was not a cause of the failure of the parties to reach agreement. Finally, we shall instruct the Board to exercise its discretion whether to take additional evidence on the issue.

DISCUSSION

I

*In order to impose make-whole relief, the Board should have found that, but for Dal Porto's refusal to bargain, the parties would have entered into a collective bargaining agreement providing for higher pay. However, there is a rebuttable presumption, affecting the burden of proof, that the parties would have consummated such an agreement had they bargained exclusively in good faith.*

Dal Porto's first three contentions are best taken together. We shall recount Dal Porto's argument and then discuss it.

Dal Porto points out that, "The Board derives its authority to impose the make-whole remedy from Labor Code section 1160.3. That section provides that when the Board finds an employer guilty of an unfair labor practice for refusal to bargain in good faith, it may enter an order 'requiring such person to cease and desist from such unfair labor practice, to take affirmative action, including reinstatement of employees with or without backpay, and *making employees whole, when the Board deems such relief appropriate, for the loss of pay resulting from the employer's refusal to bargain,* and to provide such other relief as will effectuate the policies of this part.' " (*J. R. Norton Co. v. Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 27 [160 Cal.Rptr. 710, 603 P.2d 1306], original italics; see *Lindeleaf* v. *Agricultural Labor Relations Bd.* (1986) 41 Cal.3d 861, 880-881 [226 Cal.Rptr. 119, 718 P.2d 106].)

Dal Porto says the statute provides a remedy to make an employee "whole" for "the loss of pay resulting from the employer's refusal to bargain." Dal Porto suggests there can be such a loss of pay only if the parties would have entered into a contract had the parties bargained wholly in good faith. In the absence of a contract, the employees have lost no pay as a result of the employer's refusal to bargain. Thus, Dal Porto says the make-whole remedy may be imposed only where the Board makes an express finding that, had the employer not breached the obligation to bargain in good faith, a contract would have been entered into with the union.[2]

In the instant case, Dal Porto asserts the Board did not and could not make such a finding because honest differences about wages and successorship precluded consummation of an agreement. Thus, Dal Porto argues the record shows the parties had bargained in good faith to impasse.

According to Dal Porto, the controlling analysis is that applicable to dual-motive employee discharges, as set forth in *Martori Brothers Distributors* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 721 [175 Cal.Rptr. 626, 631 P.2d 60]. In *Martori Brothers* an employee was discharged allegedly for dual motives—disruptiveness on the job and union activity—only the former of which was a lawful reason. Our Supreme Court explained, "When it appears that an employee was dismissed because of combined valid business reasons as well as for invalid reasons, such as union or other protected activities, the question becomes whether the discharge would not have occurred 'but for' the protected activity. [Citations.]" (*Id.,* at p. 729.)

A. *History of the NLRA make-whole remedy.*

The history of the Board's make-whole remedy is helpful to an analysis of Dal Porto's argument. The National Labor Relations Act (NLRA) does not expressly authorize a make-whole remedy. (See 29 U.S.C. § 160.) Before 1970, various commentators were of the view that then-recognized remedies under the NLRA were ineffective to deter or redress employers' unlawful refusals to bargain, because the remedies failed to discourage employers from delaying good faith bargaining as long as possible, thereby diminishing union strength and postponing payment of higher wages and benefits. (See, e.g., Note, *An Assessment of the Proposed "Make-Whole" Remedy in Refusal-To-Bargain Cases* (1968) 67 Mich.L.Rev. 374; Note, *Monetary Compensation as a Remedy for Employer Refusal to Bargain* (1968) 56 Geo. L.J. 474; Comment, *Employee Reimbursement for an Employer's Refusal to Bargain, The Ex-Cell-O Doctrine* (1968) 46 Tex. L.Rev. 758.)

---

[2]Implicit in the argument is the assumption the contract would provide for higher pay.

In the wake of these comments, the federal make-whole remedy was fashioned by the Court of Appeals for the District of Columbia Circuit in *International Union of E., R. & M. W., AFL-CIO* v. *N.L.R.B.* [*Tiidee Products*] (1970) 138 App.D.C. 249 [426 F.2d 1243], certiorari denied (1970) 400 U.S. 950 [27 L.Ed.2d 256, 91 S.Ct. 239]. (See generally, Note, *NLRB Power to Award Damages in Unfair Labor Practice Cases* (1971) 84 Harv.L.Rev. 1670.) The court ordered the NLRB to consider, as a remedy, "damages based upon a determination of what the parties themselves would have agreed to if they had engaged in the kind of bargaining process required by the Act." (*Tiidee Products, supra,* 426 F.2d at p. 1253.) Statutory authority was located in section 10(c) of the NLRA (29 U.S.C. § 160(c)), which commanded the National Labor Relations Board "to take such affirmative action . . . as will effectuate the policies of this subchapter." ( *Tiidee Products, supra,* 426 F.2d at p. 1248.) The court perceived that the make-whole remedy was necessary in certain cases to afford employees a remedy against unwarranted delay resulting from an employer's refusal to bargain. (*Id.,* at pp. 1249-1250; see *J. R. Norton Co., supra,* 26 Cal.3d at p. 31.)

Subsequently, in *Ex-Cell-O Corp.* ((1970) 185 N.L.R.B. No. 20, 74 L.R.R.M. 1740) the NLRB refused to follow *Tiidee Products,* claiming the make-whole remedy exceeded its statutory authority. Once again, the District of Columbia Circuit ordered the remedy. (*International Union, U. A., A. & A. Imp. Wkrs.* v. *N.L.R.B.* [*Ex-Cell-O*] (1971) 145 App. DC [449 F.2d 1046, 1050].)

The make-whole remedy was expressly included in section 1160.3 of the ALRA to resolve the question of the Board's authority to grant such relief. (*J. R. Norton Co.* v. *Agricultural Labor Relations Bd., supra,* 26 Cal.3d at pp. 37-38.)

In *Adam Dairy* (1978) 4 ALRB No. 24, the Board decided a variety of issues related to its administration of the make-whole remedy. Of immediate interest are the Board's conclusions that "the statutory scheme does not require that parties agree to a contract" (*id.,* at p. 8, fn. 4) and that the make-whole remedy could be imposed "without imposing a requirement that the parties reach a contract and without dictating any terms of a contract." (*Id.,* at p. 11.) Rather, the Board imputed a hypothetical contract to the employer. (*Id.,* at p. 12.) The Board then ordered the employees' loss of wages to be determined by a comparison of what the employees would have received (based on an average wage in those contracts negotiated by the union) and what they were then receiving.[3] (*Ibid.,* see *Holtville Farms, Inc.*

---

[3]The Board set forth a separate method for calculating fringe benefits, also unrelated to any contract. (See *Adam Dairy, supra,* at pp. 24-28.)

v. *Agricultural Labor Relations Bd.* (1985) 168 Cal.App.3d 388, 396-397 [214 Cal.Rptr. 241].)

Since *Adam Dairy,* the Board has periodically adjusted its methods of calculating wages and fringe benefits under the hypothetical contract imputed to the employer for purposes of make-whole relief. (See, e.g., *Robert H. Hickam* (1983) 9 ALRB No. 6; *Kyutoku Nursery, Inc.* (1982) 8 ALRB No. 73.) However, to our knowledge, the Board has never required a finding that the parties would have consummated a contract as a prerequisite to make-whole relief. (See, e.g., *Phillip D. Bertelsen* (1986) 12 ALRB No. 27; *Maggio, Inc.* (1986) 12 ALRB No. 16; *Muranaka Farms* (1986) 12 ALRB No. 9; *J. R. Norton Company, Inc.* (1984) 10 ALRB No. 42.)

B. *Section 1160.3 requires the Board to find a collective bargaining agreement providing for higher pay would have been concluded in the absence of Dal Porto's refusal to bargain.*

We are unable to quarrel with Dal Porto's argument that the Board should have found a contract, providing higher pay for employees, would have been concluded but for Dal Porto's refusal to bargain.[4] In accordance with the rule established in *Adam Dairy,* the Board made no such finding.

Our review of the Board's rule is guided by the remarks of our Supreme Court in *J. R. Norton Co., supra,* 26 Cal.3d 1, where the court concluded the Board had exceeded its statutory authority: "In reviewing the Board's rule for the application of the make-whole remedy, we are cognizant of the principle that an administrative agency is entitled to deference when interpreting policy in its field of expertise. (See, e.g., *Phelps Dodge Corp.* v. *Labor Board* (1941) 313 U.S. 177, 194 [85 L.Ed. 1271, 1283, 61 S.Ct. 447, 133 A.L.R. 1217].) Nevertheless, as we observed in *Clean Air Constituency* v. *California State Air Resources Bd.* (1974) 11 Cal.3d 801, 813-814 [114 Cal.Rptr. 577, 523 P.2d 617].) 'It is fundamental in statutory construction that courts should ascertain the intent of the Legislature so as to effectuate the purpose of the law.' Thus, when administrative rules or regulations 'alter or amend the statute or enlarge or impair its scope,' they 'are void and courts not only may, but it is their obligation to strike down such regulations. [Citations.]' (*Morris* v. *Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697].)" (*Id.,* at p. 29.)

---

[4]The same issue was tendered in *Holtville Farms, Inc.* v. *Agricultural Labor Relations Bd., supra,* 168 Cal.App.3d 388, but the court concluded the issue was not properly raised. (P. 398.) Here, Dal Porto tendered the issue to the Board; it is properly before us. The Board makes no contention to the contrary.

We note that in *Adam Dairy, supra,* 4 ALRB No. 24, the Board undertook no analysis of the language of section 1160.3 in reaching its conclusion consummation of an agreement need not be shown. (*Id.,* at pp. 4, 11.) However, neither the Board nor this court has the authority to disregard the language of the applicable statute. Pursuant to section 1160, the Board's powers to prevent unfair labor practices are limited to those set forth in the chapter of the ALRA containing section 1160.3.[5] Section 1160.9 provides, "The procedures set forth in this chapter [of which section 1160.3 is a part] shall be the exclusive method of redressing unfair labor practices." This court must not only apply section 1160.3 but must give significance to its every word, phrase and sentence. (*J. R. Norton Co., supra,* 26 Cal.3d at p. 36.) In addition, we must recognize that, " '[W]hatever is necessarily implied in a statute is as much a part of it as that which is expressed.' " (*Welfare Rights Organization* v. *Crisan* (1983) 33 Cal.3d 766, 771 [190 Cal.Rptr. 919, 661 P.2d 1073], quoting *Johnston* v. *Baker* (1914) 167 Cal. 260, 264 [139 P. 86], followed in *Griffis* v. *County of Mono* (1985) 163 Cal.App.3d 414, 428 [209 Cal.Rptr. 519].)

We agree with Dal Porto that consummation of a collective bargaining agreement is necessarily implied in section 1160.3 as a prerequisite for application of the make-whole remedy.

We note first that section 1160.3 authorizes make-whole relief not as a penalty for unacceptable conduct but rather for the purpose of "*making employees whole*" for losses of pay suffered by employees: "make-whole relief is compensatory in that it reimburses employees for the losses they incur as a result of delays in the collective bargaining process." (*J. R. Norton, supra,* 26 Cal.3d at p. 36.) The compensatory nature of make-whole relief is in accord with the established rule that the Board's " 'power to command affirmative action is remedial, *not punitive,* . . .' " (*Laflin & Laflin* v. *Agricultural Labor Relations Bd.* (1985) 166 Cal.App.3d 368, 380 [212 Cal.Rptr. 415], quoting *Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 93 Cal.App.3d 922, 940 [156 Cal.Rptr. 152]; italics in original.) If make-whole relief were imposed where the parties would not have entered into an agreement even had they bargained in good faith, the "relief" would in fact be a penalty for the employer's bad faith bargaining. Had the Legislature intended to punish the employer in these circumstances, it could easily have said so.

---

[5]Section 1160 provides: "The board is empowered, *as provided in this chapter,* to prevent any person from engaging in any unfair labor practice, as set forth in Chapter 4 (commencing with section 1153) of this part." (Italics added.)

Other language in section 1160.3 supports this view. Thus, a "loss of pay," upon which the remedy is based, necessarily assumes greater pay by which the loss is measured. The only logical place to locate the greater pay is in a collective bargaining agreement that would have been consummated but for the employer's refusal to bargain. By that construction, the loss of pay is one "resulting from the employer's refusal to bargain," as section 1160.3 requires, because the employer's refusal to bargain has wrongfully prevented consummation of an agreement. Consummation of a collective bargaining agreement is also consistent with *J. R. Norton*'s conclusion the make-whole remedy is designed to redress losses caused by "delays in the collective bargaining process." (*J. R. Norton, supra,* 26 Cal.3d at p. 36.) "*Delay*" necessarily implies a conclusion happens later. Here, the only logical conclusion is consummation of an agreement.

Finally, we note that under the NLRA make-whole relief has been premised on the finding the parties would have entered into a collective bargaining agreement in the absence of the employer's unfair practices. ■ While we have no authority to disregard the language of section 1160.3—and we do not—it is clear that California's statutory remedy was modeled on the federal remedy, so that the federal remedy is properly consulted to resolve uncertainties in the state statute.[6] (See *J. R. Norton Co., supra,* 26 Cal.3d at pp. 30-32.) In *Tiidee Products,* the court cautioned its remand did not compel agreement when the parties themselves are unable to agree (see *Porter Co.* v. *NLRB* (1970) 397 U.S. 99, 108 [25 L.Ed.2d 146, 153, 90 S.Ct. 821]: "*We in no way suggest either that the Board can compel agreement or that the make-whole remedy is appropriate under circumstances in which the parties would have been unable to reach agreement by themselves.*" (*Tiidee Products, supra,* 426 F.2d at p. 1253, italics added.) "The awarding of compensatory damages is predicated on the assumption that if the parties had bargained in good faith, a contract would have been signed. Thus, the Board should refuse to award any damages unless persuaded that a contract would have been signed." (Note, *op. cit. supra,* 84 Harv.L.Rev. at p. 1695, fns. omitted.)

■ For these reasons, we hold section 1160.3 necessarily contemplates make-whole relief may be imposed only where the parties would have entered into a collective bargaining agreement providing for higher pay in the absence of the employer's refusal to bargain. The Board's conclusion to

---

[6]Because the ALRA was modeled largely on the provisions of the NLRA, courts look to applicable administrative and judicial interpretations of the federal act to arrive at an appropriate interpretation of the state act. (See § 1148; *Highland Ranch* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 848, 855-856; *Dal Porto I, supra,* 163 Cal.App.3d at p. 548, fn.4.)

the contrary in *Adam Dairy* cannot be reconciled with the statutory language and was therefore erroneous.[7]

### C. *The employer's refusal to bargain must cause the failure to reach agreement.*

We also think it clear the employer's refusal to bargain must cause the failure to consummate an agreement. The statute says the loss of pay must be one "resulting from the employer's refusal to bargain." (§ 1160.3.) The language of the statute is unambiguous. "When statutory language is clear and unambiguous, there is no need for construction and courts should not indulge in it. [Citations.]" (*People* v. *Overstreet* (1986) 42 Cal.3d 891, 895 [231 Cal.Rptr. 213, 726 P.2d 1288].) It follows that if an employer's refusal to bargain as to certain issues plays no part in the failure of the parties to reach agreement, because legitimate disagreements on crucial issues precluded agreement, then there is no loss of pay "resulting from" the refusal and make-whole relief is inappropriate. (Cf. *Latrobe Steel Co.* v. *N.L.R.B.* (3d Cir. 1980) 630 F.2d 171, 180-181 [improper insistence by employer on nonmandatory subjects of bargaining harmless where parties were legitimately deadlocked over mandatory subjects].)

---

[7]In *Adam Dairy, supra,* 4 ALRB No. 24, the Board adopted a rule absolutely precluding the parties from introducing evidence on the question whether an agreement would have been consummated in the absence of the employer's refusal to bargain. (*Id.,* at p. 12.) Since section 1160.3 envisions that such an agreement be shown, the Board's rule is in fact a conclusive presumption, i.e., that the parties would have concluded a collective bargaining agreement had the employer bargained in good faith. "A presumption is an assumption of fact that the law requires to be made from another fact or group of facts found or otherwise established in the action." (Evid. Code, § 600, subd. (a).) "If basic facts A and B are believed, then conclusion C must be presumed to be true. If the presumption is conclusive, no evidence, however convincing, will be admitted to refute C." (Note, *In re Lisa R.—Limiting the Scope of the Conclusive Presumption Doctrine* (1976) 13 San Diego L.Rev. 377, 384.) "A conclusive presumption is in actuality a substantive rule of law . . . ." (*Kusior* v. *Silver* (1960) 54 Cal.2d 603, 619 [7 Cal.Rptr. 129, 354 P.2d 657]; 1 Witkin, Cal. Evidence (3d ed. 1986) § 277, p. 237.)

There is substantial doubt whether the Board has the authority to promulgate such a presumption. (See Evid. Code, §§ 160, 600; *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 697-698 [209 Cal.Rptr. 682, 693 P.2d 261].) Moreover, the constitutionality of such a presumption is questionable. (See, e.g., *Weinberger* v. *Salfi* (1975) 422 U.S. 749 [45 L.Ed.2d 522, 95 S.Ct. 2457]; *Cleveland Board of Education* v. *La Fleur* (1974) 414 U.S. 632 [39 L.Ed.2d 52, 94 S.Ct. 791]; *Vlandis* v. *Kline* (1973) 412 U.S. 441 [37 L.Ed.2d 63, 93 S.Ct. 2230]; *Stanley* v. *Illinois* (1972) 405 U.S. 645 [31 L.Ed.2d 551, 92 S.Ct. 1208]; *Michelle W.* v. *Ronald W.* (1985) 39 Cal.3d 354 [216 Cal.Rptr. 748, 703 P.2d 88]; *Estate of Cornelious* (1984) 35 Cal.3d 461 [198 Cal.Rptr. 543, 674 P.2d 245]; *In re Lisa R.* (1975) 13 Cal.3d 636 [119 Cal.Rptr. 475, 532 P.2d 123, 90 A.L.R.3d 1017]; Risinger, *"Substance" and "Procedure" Revisited* (1982) 30 UCLA L.Rev. 189; Note, *Irrebuttable Presumptions: An Illusory Analysis* (1975) 27 Stan.L.Rev. 449; Note, *The Supreme Court, 1974 Term* (1975) 89 Harv.L.Rev. 47, 77-85.) However, we have no occasion to resolve these questions here. We simply conclude the Board misread section 1160.3 when it ruled the statute did not require proof of consummation of an agreement.

From this conclusion it follows that where, as here, both innocent and wrongful bargaining conduct by the employer are alleged to cause the failure to reach agreement, the but-for test of *Martori Brothers Distributors* v. *Agricultural Labor Relations Bd., supra,* 29 Cal.3d 721, should be applied. In the context of job terminations, we recently noted that the but-for test "provides a convenient method for a factfinder to isolate the effects of permissible and impermissible reasons for a termination. It asks no more than, given only proper reasons, would the same decision have been made? Using this test, an employee learns the 'true' reason for his termination." (*Short* v. *Nevada Joint Union High School Dist.* (1985) 163 Cal.App.3d 1087, 1098 [210 Cal.Rptr. 297].) Here the test is applied to ascertain the "true" reason for the failure of parties to reach an agreement. The test is whether, but for the employer's unlawful refusal to bargain, the parties would have concluded a collective bargaining agreement.

The next question is how the burden of proving these matters should be allocated between the parties.

D. *There is a rebuttable presumption, affecting the burden of proof (persuasion), operating against the employer, that the parties would have consummated a collective bargaining agreement, providing for higher pay, had the employer bargained exclusively in good faith.*

■ Dal Porto asserts the Board must prove the parties would have consummated an agreement, but we cannot agree. As we have seen, Dal Porto relies on *Martori Brothers Distributors* v. *Agricultural Labor Relations Bd., supra,* 29 Cal.3d 721. However, the *Martori Brothers* test, like a deck of cards, is useful only if all of it is there. An integral part of *Martori Brothers'* analysis is its shifting of the burden of persuasion on the question of the causal effect of an employer's wrongful conduct: "[O]nce the employee has shown that his union activities were a motivating factor in the employer's decision to discharge him, the burden shifts to the employer to show that discharge would have occurred in any event. If the employer fails to carry his burden in this regard, the board is entitled to find that discharge was improper. [Citation.]" (*Id.,* at p. 730.)

Shifting the burden on the question of causation to the employer is particularly appropriate in the present context. The effect on the bargaining process of an unfair labor practice would often be difficult if not impossible to ascertain. The question whether a collective bargaining agreement would have been consummated but for an unlawful practice could involve attempts to reconstruct a fictional process of collective bargaining negotiations, i.e., one in which the employer always bargained in good faith. However, the tempo,

momentum, psychology, and results of labor negotiations are ordinarily too unpredictable and complex to permit their facile imaginary reconstruction. (See, e.g., Note, *op. cit. supra,* 67 Mich.L.Rev. at op. 382-384.) The effect of unlawful conduct on the progress of negotiations is therefore ordinarily one of uncertainty.

"The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." (*Bigelow* v. *RKO Radio Pictures* (1946) 327 U.S. 251, 265 [90 L.Ed. 652, 660, 66 S.Ct. 574].) In accordance with this rule, the courts have often placed responsibility for evidentiary uncertainty arising out of labor disputes upon the responsible party—the one that engaged in unlawful conduct. Thus, for example, in *Highland Ranch* v. *Agricultural Labor Relations Bd., supra,* 29 Cal.3d 848, our Supreme Court considered a distinct but analogous "limited back pay" remedy compensating employees for an employer's refusal to bargain. (Pp. 862-863.) There, agricultural employees who were improperly laid off were awarded their daily wages as of the date of layoff until certain specified conditions were met. (*Ibid.*) Quoting a federal decision, the court explained that the remedial order was, of necessity, only an approximation and not an exact equivalent of the situation that would have obtained had the employer fulfilled its bargaining obligations: " 'Under the circumstances of this case . . . it is impossible to reestablish a situation equivalent to that which would have prevailed had the [employer] more timely fulfilled its statutory bargaining obligation. In fashioning an appropriate remedy, we must be guided by the principle that the wrongdoer, rather than the victims of the wrongdoing, should bear the consequences of his unlawful conduct, . . .' " (*Id.,* at p. 863, quoting *Transmarine Navigation Corp.* (1968) 170 N.L.R.B. 389.)

Similarly, in *Tiidee Products, supra,* 426 F.2d 1243, the court condemned the NLRB's reliance on "uncertainty" as a justification for its refusal to incorporate make-whole relief as a remedy under the NLRA. (*Id.,* at p. 1251.) The court noted the wrongdoer should bear the risk of the uncertainty which his own wrong created. (*Ibid.*)

Here, the employer must bear the consequence of its illegality by proving it had no effect on the failure to conclude a collective bargaining agreement. Thus, once the Board produces evidence showing the employer unlawfully refused to bargain, the burden of persuasion shifts to the employer to prove no agreement calling for higher pay would have been concluded in the absence of the illegality. (See *Martori Brothers, supra,* 29 Cal.3d at p. 730.) If the employer fails to carry its burden in this regard, the Board is entitled to find an agreement providing for higher pay would have been concluded

in the absence of the employer's refusal to bargain. The Board should then *impute* to the parties an "agreement" and to measure losses of pay and benefits with reference to the *imputed contract.* (See *Martori Brothers, supra,* at p. 730; *Rivcom Corp.* v. *Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743, 772-773 [195 Cal.Rptr. 651, 670 P.2d 305]; *Highland Ranch* v. *Agricultural Labor Relations Bd., supra,* 29 Cal.3d at p. 866, fn. 7; see generally *Holtville Farms, Inc.* v. *Agricultural Labor Relations Bd., supra,* 168 Cal.App.3d at p. 388.)

It is obvious a contrary conclusion, placing the burden on the Board, would effectively nullify the Board's ability to impose make-whole relief in many cases and would therefore encourage employers unlawfully to refuse to bargain. Thus, for example, make-whole relief has been awarded in cases where the employer, without reasonable cause to do so, mounts a challenge to a representation election. (See, e.g., *Lindeleaf* v. *Agricultural Labor Relations Bd., supra,* 41 Cal.3d at pp. 880-881; *George Arakelian Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1985) 40 Cal.3d 654, 667-668 [221 Cal.Rptr. 488, 710 P.2d 288]; *Ruline Nursery Co.* v. *Agricultural Labor Relations Bd.* (1985) 169 Cal.App.3d 247, 263 [216 Cal.Rptr. 162]; see also *F & P Growers Assn.* v. *Agricultural Labor Relations Bd.* (1985) 168 Cal.App.3d 667 [214 Cal.Rptr. 355].) At the time of a representation election negotiations have not even begun; the issues about which the parties will bargain are unknown. It would therefore doubtless be impossible to tell whether the parties would have reached agreement had they bargained. Understandably, the cases upholding the make-whole remedy in the context of elections have never imposed upon the Board the unenviable duty of proving a contract would have been concluded were it not for the employer's unlawful interference in the election process.

Dal Porto asserts section 1160.3 prevents a shifting of the burden of persuasion to the employer. The statute provides in pertinent part, "If, upon the preponderance of the testimony taken, the board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any . . . unfair labor practice, the board shall state its findings of fact and shall [take appropriate measures] . . . ." The statute prescribes a standard of proof by a preponderance of the evidence. It does not allocate the burden of producing evidence or of persuasion to any party. Therefore, section 1160.3 does not stand in the way of allocating the burden of persuasion in accordance with the rule of *Martori Brothers.* (29 Cal.3d at p. 730.)

Nor does any other statute prevent shifting the burden to the employer.

Section 1160.2 provides in pertinent part that hearings on unfair labor practices "shall, so far as practicable, be conducted in accordance with the

Evidence Code." Evidence Code section 500 provides, "Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting."

In the present context, the "claim for relief" is pursued by way of an unfair labor practice complaint brought by the general counsel "in the name of the Board." (Cal. Admin. Code, tit. 8, § 20220; see § 1160.2.) Evidence Code section 500 thereby places upon the Board the burden of persuasion as to each fact necessary to establish the claim, "Except as otherwise provided by law, . . ."

Here, the burden of persuasion may be shifted by a presumption "affecting the burden of proof." (Evid. Code, §§ 605, 606.) "The power of the higher courts to create presumptions is expressly recognized by Ev.C. 600 (assumption that 'the law requires to be made') read in connection with Ev.C. 160 ('law' includes 'decisional law')." (1 Witkin, Cal. Evidence, *op. cit. supra,* § 220, p. 175.) "Unlike presumptions affecting the burden of producing evidence, which exist merely to expedite resolution of disputes, '[a] presumption affecting the burden of proof is a presumption established to implement some public policy other than to facilitate the determination of the particular action in which the presumption is applied, such as the policy in favor of establishment of a parent and child relationship, the validity of marriage, the stability of titles to property . . . .' (Evid. Code, § 605.) The purpose of such a rebuttable presumption relates to public policy goals 'other than or in addition to the policy of facilitating the trial of actions.' (Cal. Law Revision Com. com. on Evid. Code, § 605.) As the California Law Revision Commission observes, '[f]requently, presumptions affecting the burden of proof are designed to facilitate determination of the action in which they are applied. Superficially, therefore, such presumptions may appear merely to be presumptions affecting the burden of producing evidence. What makes a presumption one affecting the burden of proof is the fact that there is always some further reason of policy for the establishment of the presumption. It is the existence of this further basis in policy that distinguishes a presumption affecting the burden of proof from a presumption affecting the burden of producing evidence.' (*Ibid.*)" (*Fisher* v. *City of Berkeley, supra,* 37 Cal.3d 644, 695.)

The "further reason of policy" justifying the instant presumption is the need to discourage employers from unlawfully refusing to bargain under the ALRA.

█ Nor does the rebuttable presumption (that a contract would have been concluded had the parties bargained wholly in good faith) suffer from

constitutional infirmity. "The rule is settled that a [rebuttable] presumption of one fact from evidence of another is violative of due process if there is no rational connection between the fact proved and the fact presumed. [Citations.] Courts have sometimes explained the rational connection requirement as meaning that, according to the teachings of experience, the proved fact must at least be a 'warning signal' of the presumed fact and have a 'sinister significance.' [Citation.]" (*People* v. *Stevenson* (1962) 58 Cal.2d 794, 797 [26 Cal.Rptr. 297, 376 P.2d 297].)

Here, the "proved fact" is participation in good faith bargaining. The "presumed fact" is consummation of a collective bargaining agreement providing for higher pay. Empirical studies have shown that collective bargaining agreements are concluded in 86 percent of cases where employers and employees subject to NLRB jurisdiction bargain for the first time in good faith. (Ross, The Labor Law in Action: An Analysis of the Administrative Process Under the Taft-Hartley Act (1966) p. 12, cited in Comment, *op. cit. supra,* 46 Tex. L.Rev. at p. 764.) There is no reason to believe the arena of agricultural bargaining is sufficiently unique to make the NLRB data inapplicable. Moreover, the Board's own track record of imposing make-whole damages, based on a differential between what the employees were receiving and what comparable negotiated contracts provided, shows employees ordinarily obtain higher pay in negotiated contracts. (See, e.g., *Muranaka Farms, supra,* 12 ALRB No. 9; *Joe G. Fanucchi & Sons* (1986) 12 ALRB No. 8; see esp. *J. R. Norton Company, Inc., supra,* 10 ALRB No. 42 at pp. 24-31.) This data supplies a sufficient rational connection between the fact proved and the fact presumed to satisfy due process.

This leaves the question: by what evidence may the employer try to prove no contract would have been concluded? Plainly the Board need not waste its time indulging speculative evidentiary wheel-spinning. ■ Wholly speculative evidence is not relevant and is properly excluded. (*People* v. *Parrison* (1982) 137 Cal.App.3d 529, 539 [187 Cal.Rptr. 123]; *People* v. *Allen* (1976) 65 Cal.App.3d 426, 434 [135 Cal.Rptr. 276].)[8] Nothing prohibits the Board from adopting rules limiting attempts to present irrelevant evidence.

---

[8]"Unreliable evidence lacks trustworthiness and is speculative; therefore it is irrelevant. (See *People* v. *Allen* (1976) 65 Cal.App.3d 426, 434 [135 Cal.Rptr. 276].) Only relevant evidence is admissible. (Evid. Code, § 350.) Evidence is relevant if it has any tendency in reason to prove or disprove any disputed fact. (*Ibid.*; Evid. Code, § 210.) A proffered evidentiary item must, in the light of logic, reason, experience, or common sense, have by reasonable inference a tendency to prove or disprove a disputed fact. (1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 21.3, rule (1)(b), p. 501.) The court must exclude irrelevant proffered evidence which has a tendency to prove or disprove a disputed fact only if the trier of fact must draw speculative or conjectural inferences from it. (*Id.,* at p. 502.)" (*People* v. *Parrison, supra,* 137 Cal.App.3d at p. 539.)

Thus, for example, we have no quarrel with the Board's methods for determining "pay" lost by employees by resort to comparable contracts actually negotiated. (See *Holtville Farms, Inc.* v. *Agricultural Labor Relations Bd., supra,* 168 Cal.App.3d at pp. 396-397.) The Board need not entertain attempts to prove the actual terms and conditions of a contract the parties never entered into.

In the instant case, however, Dal Porto does not proffer speculative evidence about what might have happened in the future. Rather, Dal Porto says its claim is shown by historical facts, i.e., the parties had bargained wholly in good faith to impasse. (See *Latrobe Steel Co.* v. *N.L.R.B., supra,* 630 F.2d at pp. 180-181.)

"The Board has defined good faith bargaining as such bargaining as leads to either contract or a bona fide impasse." (*Ruline Nursery Co.* v. *Agricultural Labor Relations Bd., supra,* 169 Cal.App.3d at p. 263.) " 'A genuine impasse is synonymous with a deadlock; the parties have discussed a subject or subjects in good faith, and despite their best efforts to achieve agreement with respect to such, neither party is willing to move from its respective position.' " (*Electric Machinery Co.* v. *N.L.R.B.* (5th Cir. 1981) 653 F.2d 958, 963, quoting *Hi-Way Billboards, Inc.* 206 N.L.R.B. 22 (1973) enforcement den. *sub nom. N.L.R.B.* v. *Hi-Way Billboards, Inc.* (5th Cir. 1974) 500 F.2d 181.) "Whether an impasse exists depends on whether, in view of all the circumstances of the bargaining, further discussions would be futile. [Citations.]" (*Gulf States Mfg. Inc.* v. *N.L.R.B.* (5th Cir. 1983) 704 F.2d 1390, 1398.)

We see no reason why Dal Porto should not be able to show that no contract would have been consummated because the parties had bargained to impasse. However, we note Dal Porto must show its refusal to bargain had no effect on the failure to reach agreement. "[I]t is manifest that there can be no legally cognizable impasse, i.e., a deadlock in negotiations . . . if a cause of the deadlock is the failure of one of the parties to bargain in good faith. [Citations.]" (*Industrial Union of Marine & Shipbuilding Wkrs.* v. *N.L.R.B.* (3d Cir. 1963) 320 F.2d 615, 621, cert. den. (1964) 375 U.S. 984 [11 L.Ed.2d 472, 84 S.Ct. 516]; followed in *Cone Mills Corp.* v. *N.L.R.B.* (5th Cir. 1969) 413 F.2d 445, 450; *United Packinghouse Food & Allied Wkrs. Int. U.* v. *N.L.R.B.* (1969) 135 App. DC 111 [416 F.2d 1126, 1131], rehg. den., cert. den. (1969) 396 U.S. 903 [24 L.Ed.2d 179, 90 S.Ct. 216].)

E. *The Board did not find that the parties had bargained in good faith to impasse; the case must be remanded to the Board.*

■ Dal Porto contends there is no reason to remand this case because the Board allegedly made express findings showing, in essence, that the parties had bargained wholly in good faith to impasse. However, the record will not support the contention.

Dal Porto relies on two findings of the administrative law judge (ALJ) adopted by the Board in the original proceedings. In the first finding, the ALJ said "that though these parties had agreed to many articles (most of them before the current round of negotiations commencing on Apr. 1), three main areas of disagreement continually doomed the process to ultimate failure—wages, successorship, and union security." Dal Porto interprets the ALJ's finding to mean that *each* of the three disputed issues "doomed the process to ultimate failure" even in the absence of unlawful bargaining on union security and the unlawful unilateral wage increase.

The ALJ's statement is not necessarily a finding that lawful bargaining over wages or successorship doomed the negotiations. The ALJ's statement plausibly means *the totality* of the three areas of disagreement led to the failure of negotiations as of the time unfair bargaining changes were filed. We cannot say the ALJ or the Board found that each of the disputed issues alone inexorably doomed the negotiations. Nor can we conclude the second finding asserted by Dal Porto—that Dal Porto's conduct with respect to successorship "stood in the way" of an agreement—meant the parties had bargained to impasse because of good faith differences on the issue of successorship. This is particularly so since the ALJ (and the Board) *did not expressly find that the parties had bargained to impasse* or that further negotiations were pointless.

The record therefore shows the Board never found one way or the other whether the parties would have reached agreement in the absence of Dal Porto's unlawful conduct. ■ "Ordinarily, when an administrative agency makes an adjudicatory decision, it is required to make findings sufficient both to enable the parties to determine whether and on what basis they should seek review and, in the event of review, to apprise a reviewing court of the basis for the decision. (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 514 [113 Cal.Rptr. 836, 522 P.2d 12]; see *Saleeby* v. *State Bar* (1985) 39 Cal.3d 547, 566-567 [216 Cal.Rptr. 367, 702 P.2d 525].)" (*Respers* v. *University of Cal. Retirement System* (1985) 171 Cal.App.3d 864, 870 [217 Cal.Rptr. 594].) Since the Board may have been unaware of the correct legal standard for application of the make-whole remedy in this case, the case ordinarily should be referred to the Board so it may reconsider its decision. (*Martori Brothers Distributors* v. *Agricultural Labor Relations Bd., supra,* 29 Cal.3d at p. 731; *J. R. Norton Co.* v. *Agricultural Labor Relations Bd., supra,* 26 Cal.3d at pp. 38-39.)

 We think remand is particularly appropriate where, as here, a party is assigned a burden of persuasion not previously recognized. Although *Martori Brothers* had assigned the burden to an employer in the context of a wrongful discharge from employment (29 Cal.3d at p. 730), we are unaware of any prior authority assigning the burden to the employer in the context of a make-whole order. Dal Porto may claim it would have produced additional evidence showing it had bargained to impasse had it known it had the burden of persuasion on the issue. We shall therefore remand the case to the Board for further consideration in light of our decision.

At a minimum, on this remand the Board should afford Dal Porto an opportunity to present legal arguments and to argue orally before the Board in advance of the Board's decision on the appropriate remedy. (See *Conti v. Board of Civil Service Commissioners* (1969) 1 Cal.3d 351, 362-363 [82 Cal.Rptr. 337, 461 P.2d 617].) Dal Porto may also claim evidentiary prejudice by our adoption of the rule assigning to Dal Porto the burden of persuasion. The Board should allow Dal Porto a reasonable opportunity to assert any prejudice, together with a written offer of proof detailing any additional evidence Dal Porto might want to present. Thereafter, the Board shall exercise its discretion whether to allow additional evidence to be taken on the issue. (See § 1160.3; Cal. Admin. Code, tit. 8, §§ 20260-20282.)

## II

*Imposition of make-whole relief would not deny Dal Porto equal protection of the laws.*

 Dal Porto contends section 1160.3 is unconstitutional on its face because it authorizes its "make-whole" remedy against employers but not labor organizations (*Maggio, Inc., supra,* 12 ALRB No. 26), thereby violating Dal Porto's right to the equal protection of the laws. (U.S. Const., 14th Amend.)

We shall assume for present purposes that Dal Porto may assert this issue even though it was never tendered below. (But see *County of Contra Costa v. State of California* (1986) 177 Cal.App.3d 62, 75, fn. 8 [222 Cal.Rptr. 750] [presentation of constitutional argument to administrative body develops record necessary for appellate review].)

We conclude that, to the extent section 1160.3 singles employers out for special remedies, that classification does not establish a denial of equal protection. " 'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that

affects two or more *similarly situated* groups in an unequal manner.' " (*Respers* v. *University of Cal. Retirement System, supra,* 171 Cal.App.3d at p. 875, quoting *In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549]; italics in original.) Dal Porto's contention fails at this first step; employers and employees (or their organizations) are not similarly situated. Although actions of either the employer or the union may hinder the bargaining process, the incentive to delay the process for as long as possible rests with the employer and not with the union. (See *Tiidee Products, supra,* 426 F.2d at p. 1249; *Adam Dairy, supra,* 4 ALRB No. 24 at p. 4; *Ex-Cell-O Corp., supra,* 185 NLRB No. 20, at p. 108; Note, *Make-Whole Under The Agricultural Labor Relations Act: Its Applicability and Scope* (1979) 13 U.S.F. L.Rev. 971, 990.) The incentives on labor and management being dissimilar, the law properly treats them differently. Thus, Dal Porto's equal protection claim must fail. (*In re Eric J., supra,* at p. 530; *Respers, supra,* at p. 875.)

### III

*Dal Porto's conduct justifies imposition of make-whole relief.*

Dal Porto next contends the Board's make-whole remedy is excessive in the factual circumstances of this case. We disagree. Assuming the Board were to find an agreement would have been consummated but for Dal Porto's unfair practices, a make-whole remedy would be justified.

In fashioning its remedies, " 'the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts.' " (*Harry Carian Sales* v. *Agricultural Labor Relations Bd.* (1985) 39 Cal.3d 209, 232 [216 Cal.Rptr. 688, 703 P.2d 27], quoting *NLRB* v. *Gissel Packing Co.* (1969) 395 U.S. 575, 612, fn. 32 [23 L.Ed.2d 547, 577, 89 S.Ct. 1918].) A reviewing court will reverse the Board's choice of remedy only if it amounts to an abuse of discretion. (*Harry Carian Sales, supra,* at p. 232; *Butte View Farms* v. *Agricultural Labor Relations Bd.* (1979) 95 Cal.App.3d 961, 967 [157 Cal.Rptr. 476].)

Dal Porto's sole contention is that the violations here involved, a mere " 'going through the motions' " in bad faith on the union security issue (*Dal Porto I* at pp. 551-552), and dishonestly implementing a unilateral wage increase (*Dal Porto I* at pp. 553-556), are not egregious enough to warrant the Board's chosen remedy. However, substantial evidence on the record supports a conclusion Dal Porto did not bargain in good faith. It is settled that bad faith conduct is sufficiently wrongful to warrant imposition of the make-whole remedy. (See § 1160.3; see generally, *J. R. Norton Co.* v. *Agricultural Labor Relations Bd., supra,* 26 Cal.3d at pp. 27-38; *Rivcom Corp.*

v. *Agricultural Labor Relations Bd., supra,* 34 Cal.3d at pp. 772-773; *Ruline Nursery Co.* v. *Agricultural Labor Relations Bd., supra,* 169 Cal.App.3d at p. 263; *Cardinal Distributing Co.* v. *Agricultural Labor Relations Bd.* (1984) 159 Cal.App.3d 758, 777-779 [205 Cal.Rptr. 860].)

## IV

*The make-whole remedy does not require Dal Porto to make concessions to the union.*

■ Dal Porto also contends the make-whole remedy compels it to make concessions to the union. Dal Porto reasons it must capitulate on the union security issue because nearly all other contract articles have been agreed to. Dal Porto errs.

In *Ruline Nursery Co.* v. *Agricultural Labor Relations Bd., supra,* 169 Cal.App.3d 247, the court rejected the precise contention tendered here. In that case the Board's remedial order, equivalent to the one before us, provided that the employer "should make whole all of its present and former agricultural employees for all losses of pay and other economic losses suffered by them as a result of its failure and refusal to bargain in good faith with UFW and the period of said obligation to extend from July 31, 1980, *until the date on which respondent [Ruline] commences good faith bargaining with the UFW which results in either a contract or a bona fide impasse.*" (*Id.,* at p. 263, fn. 12; italics in original.) The court held that "the make-whole obligation runs only until Ruline begins to bargain in good faith. The Board has defined good faith bargaining as such bargaining as leads to either contract or a bona fide impasse. *Such an order does not compel the employer to make concessions to the Union at the bargaining table.* Nor does it continue the make-whole order after commencement of bargaining in good faith. It was not an open-ended order." (*Id.,* at p. 263; italics added.) The same conclusion has been reached under the NLRA. (*Tiidee Products, supra,* 426 F.2d at p. 1252.) We find no error.

## V

*Dal Porto's claim that it was wrongfully denied an opportunity to be heard is moot.*

Finally, Dal Porto contends that following our first remand for reconsideration of the make-whole remedy (*Dal Porto I* at p. 562) the Board should have allowed it an opportunity to be heard before imposing its new remedial order. In light of our prior discussion, this issue is moot.

### Disposition

Let a decree issue setting aside and remanding to the Board the make-whole portion of the order under review for further proceedings consistent with the views set forth in this opinion.

Blease, J., concurred.

Evans, Acting P. J., concurred in the result.

Petitions for a rehearing were denied June 8, 1987, and the petitions of respondent and real party in interest for review by the Supreme Court were denied July 29, 1987.